Douglas SPENCER, Petitioner,

v.

ANNETT HOLDINGS,
INC., Respondent.

Annett Holdings, Inc., Counter
Claimant,

v.

Douglas Spencer, Counter Defendant.

No. 4:11–cv–598.

United States District Court,
S.D. Iowa,
Central Division.

Nov. 27, 2012.

954

Sasha Lace Monthei, Scheldrup Blades Smith Schrock & Aranza PC, Cedar Rapids, IA, for Respondent/Counter Claimant.

Donald G. Beattie, Beattie Law Firm PC, Christopher D. Spaulding, Berg Rouse Spaulding & Schmidt PLC, Des Moines, IA, for Petitioner/Counter Defendant.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court are two motions: 1) Douglas Spencer's ("Plaintiff" or "Spencer") Motion for Partial Summary Judgment (Clerk's No. 17); and 2) Annett Holdings, Inc.'s ("Defendant" or "Annett") Motion for Summary Judgment (Clerk's No. 18). Annett filed a resistance to Spencer's Motion for Partial Summary Judgment (Clerks' No. 23) and Spencer replied (Clerk's No. 28). Spencer filed a resistance to Annett's Motion for Summary Judgment (Clerk's No. 22) and Annett replied (Clerk's No. 26). The Court held a hearing on the pending motions on September 25, 2012. Clerk's No. 52. The matters are fully submitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As Spencer aptly states in his Motion for Partial Summary Judgment, "the facts of this case are immense and convoluted." Pl.'s Mot. for Partial Summ. J. ¶ 4 (Clerk's No. 17). The case reaches back five years and involves a number of state-court and agency proceedings, motions, and filings. At their most basic, the facts can be summarized as follows: Spencer claimed he injured himself at work. Annett began providing care, but Spencer was dissatis-

fied with the care provided. As a result of his dissatisfaction, Spencer initially filed this federal case on December 15, 2011 alleging multiple bad faith causes of action. *See* Clerk's No. 1. In response to an Order (Clerk's No. 5) finding the jurisdictional allegations of the Complaint lacking, Spencer filed an Amended Complaint on January 19, 2012. Clerk's No. 9. Annett answered the Amended Complaint and asserted counterclaims for fraud and related issues on February 8, 2012. *See* Clerk's No. 11. Annett denies bad faith and alleges that Spencer fabricated a story about a work injury in an effort to defraud the company and receive workers' compensation benefits for a non-work-related injury. Although complex, the relevant facts are largely undisputed.

Annett is a self-insured trucking company based out of Des Moines, Iowa that operates throughout the contiguous forty-eight states.[1] Statement of Material Facts in Supp. of Annett's Mot. for Summ. J. ("Def.'s Facts") ¶ 3 (Clerk's No. 18.1); Br. in Supp. of Resistance to Annett's Motion for Summ. J. ("Pl.'s Resistance Br.") at 1 (Clerk's No. 22.1). Spencer was an over-the-road truck driver who worked for Annett from January 2006 through April of 2008. Pl.'s App. in Resp. to Annett's Mot. for Summ. J. ("Pl.'s App.") at 50, 52 (Clerk's No. 22.5–22.22).[2] In addition to his employment as a truck driver, Spencer was a luthier who specialized in making guitars in a workshop he created in a shed behind his home in Smithville, Tennessee. Pl.'s App. at 289–90 (Spencer Dep., Feb. 1, 2011, at 17–18).

---

**1.** Annett does business under the name of TMC Transportation. Def.'s App. at 256 (Martha Grice Dep. at 3) (Clerk's No. 18.5).

**2.** Spencer's appendix filed in conjunction with his resistance to Annett's Motion for Summary Judgment is made up of Clerk's

Nos. 22.5 through 22.22. The appendix is consecutively paginated. Throughout this Order, the Court will not individually identify within which appendix portion each fact is located; rather, the appendix will be cited as a whole.

### A. Spencer's Alleged Work Injury and Immediate Treatment

Spencer claims that on the morning of January 2, 2007, he slipped off the back of his flatbed trailer near Smithville and injured himself. Def.'s Facts ¶ 5. Spencer informed his employer, Annett, of the accident and immediately sought medical attention from a doctor in a nearby town. Id.; Pl.'s Statement of Additional Material Facts ("Pl.'s Add'l Facts") ¶ 2 (Clerk's No. 22.2). The medical report from the date of the alleged injury indicates that Spencer complained of severe left knee pain, some shoulder pain, and claimed that the injuries resulted from a fall off the back of his trailer. Def.'s App. in Supp. of Annett's Mot. for Summ. J. ("Def.'s App.") at 61–66 (Clerk's Nos. 18.2–18.7).[3] Two days later, at Annett's urging and with Annett's authorization, Spencer saw a second doctor in Tennessee, Dr. Ramsey Walker ("Dr. Walker"). Def.'s Facts ¶ 7. Dr. Walker reported the same symptoms as the original emergency room doctor, restricted Spencer's work to light-duty tasks, stated Spencer should not drive a truck, and recommended a follow-up appointment in one week. Id.; Def.'s App. at 69. Annett offered Spencer light-duty work in Des Moines, and Spencer returned to Des Moines on January 8. Def.'s Facts ¶ 8.

Upon Spencer's return, Annett followed the recommendation of the authorized physician, Dr. Walker, and scheduled a January 11 appointment with Dr. Kary Schulte ("Dr. Schulte"), an orthopedic specialist in Des Moines. Id. ¶ 9. Dr. Schulte saw Spencer on January 11 and noted that Spencer said his left knee felt better. Id. ¶ 11. Dr. Schulte reported that Spencer's swelling had subsided, Spencer had 5/5 strength with flexion and extension of both knees, and that the "exam was essentially within normal limits." Id. ¶ 13; Def.'s App. at 18. Additionally, Dr. Schulte diagnosed Spencer with mild underlying degenerative arthritis in the knee. Def.'s Facts ¶ 12. Following the examination, Dr. Schulte indicated no further medical intervention was necessary and released Spencer to work without restrictions. Id. ¶ 14.

### B. Spencer's Continued Pain and Doctor's Visits in April 2007

On January 12, 2007, after obtaining a medical clearance from the Iowa Department of Transportation, Spencer returned to work driving for Annett. Id. ¶¶ 17–18. From January 12 to March 30, 2007, Spencer performed all duties adequately, and never informed Annett that he was having any problems performing job duties or having any problems with his knee. Id. ¶ 18. Spencer claims, however, that although he did not report anything to Annett, he was in severe pain and was taking measures to ease pain and swelling.[4] Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 18 (Clerk's No. 22.3).

Without seeking authorization from Annett, Spencer visited his family doctor, Dr. Bryan, on March 31, 2007, citing pain in his left knee. Def.'s Facts ¶ 20. Spencer told Dr. Bryan that, in addition to his knee pain, he was having pain in the heel of his left foot (later diagnosed as plantar fasciit-

---

3. Like Spencer's appendix, Annett's Appendix filed in conjunction with its Motion for Summary Judgment is comprised of multiple documents. It is made up of Clerk's Nos. 18.2 through 18.7 and is consecutively paginated. Again, throughout this Order, the Court will not individually identify within which appendix portion each fact is located—the appendix will be cited as a whole.

4. Spencer indicates he put ice on the knee when possible, took pain medication, and wore a brace. Pl.'s App. at 299 (Spencer Dep. at 57). Despite this, he never complained to Annett during mid-January to the end of March, and did not inform Annett of pain until April 9. Id.; Def.'s Reply to Pl's Resp. to Its Statement of Material Facts ¶ 21 (Clerk's No. 26.2).

is) and numbness in his hands and arms. *Id.* Spencer began a week-long pre-scheduled vacation the next day. *Id.* ¶ 19. On April 4, 2007, again without informing Annett or seeking authorization, Spencer returned to see Dr. Bryan. *Id.* ¶ 23. At the appointment, Dr. Bryan ordered an MRI and referred Spencer to an orthopedic specialist in Tennessee—Dr. Dalton. *Id.* Dr. Bryan also put Spencer on no-work status. Def.'s App. at 53–54. Spencer underwent the unauthorized MRI on April 6. *Id.* at 109. Despite his pain, his multiple doctor visits, and the MRI, Spencer did not call or inform Annett of any problems until April 9, 2007. *Id.* at 54.

A week after informing Annett of his problems, Spencer saw the orthopedic specialist, Dr. Dalton. Def.'s Facts ¶ 25. At this unauthorized April 16, 2007 appointment, Dr. Dalton interpreted the MRI results, diagnosed Spencer with a left medial meniscus tear, and opined that arthroscopic surgery was necessary. *Id.* At this visit, Spencer again complained of pain in his left heel and pain and numbness in both of his hands. *Id.* ¶ 26. Dr. Dalton then renewed Spencer's no-work status. Pl.'s Add'l Facts ¶ 59.

On the same day, April 16, 2007, Spencer's wife ("Mrs. Spencer") faxed the MRI report to Annett along with paperwork stating that Spencer had scheduled surgery for May 4, 2007. *Id.* ¶ 31. The fax indicated that Spencer needed authorization for this surgery. *Id.* Mrs. Spencer also called Annett and asserted that the surgery was related to the alleged fall on January 2. *Id.* In addition, during her phone call, Mrs. Spencer reported that Spencer was experiencing bilateral carpal tunnel syndrome that he believed was work-related. *Id.* On April 24, 2007, Annett received a handwritten letter from Spencer explaining that he had plantar fasciitis and that he wanted to give notice that the condition was also work-related. *Id.* ¶ 33. The same day, Annett began investigating Spencer's claims and requested medical records from Dr. Dalton. *Id.* ¶ 32. Annett also faxed Dr. Schulte a copy of the MRI for his review. *Id.* Schulte responded, however, that he could not offer a proper diagnosis without seeing Spencer and the original films. *Id.* A few days later, Annett refaxed record requests to Dr. Dalton and, for the first time, faxed medical record requests to Dr. Bryan. Def.'s App. at 55.

## C. *The Jurisdictional Dispute*

On May 2, 2007, Annett received a letter from Attorney Russell Thomas ("Thomas") explaining that Spencer had retained Thomas to represent him in a workers' compensation case. Def.'s Facts ¶ 34. The letter stated that Spencer was electing to proceed with his workers' compensation claim under Tennessee, rather than Iowa, law. *Id.* It went on to explain that, due to the circumstances of the case, under Tennessee law, Spencer had the ability to make his own arrangements for medical care. *Id.* Finally, the letter conclusively stated that Spencer was going to have surgery on May 11, 2007, and that Annett would have to reimburse Spencer for the surgery. *Id.* On May 3, 2007, Spencer filed for workers' compensation benefits in Tennessee. *Id.* ¶ 37.

Annett's counsel responded to Thomas on May 8, 2007, explaining that Iowa law controlled the case, per Spencer's election, and requested that Spencer return to Des Moines to be evaluated by Dr. Schulte.[5]

---

5. In responding in such a manner, Annett relied on a "Memorandum of Understanding and Consent" signed by Spencer at the beginning of his employment with Annett that stated, in pertinent part: "Employee agrees that should Employee sustain any injury or illness arising from his/her employment with Employer, any such proceeding, action, or investigation, shall be governed exclusively by and in accordance with the laws of the State of

*Id.* ¶ 35. The letter further stated that if Dr. Schulte determined that the surgery was required and was related to the alleged work injury, Annett would authorize the procedure. *Id.* On May 10, Annett received a response from Thomas stating that Spencer had applied for Tennessee benefits and was postponing his surgery until the jurisdictional dispute was settled. *Id.* ¶ 39. On May 21, Annett received a letter from Dr. Dalton indicating the same, i.e., Spencer's surgery was postponed until the resolution of the jurisdictional issue. *Id.* ¶ 40. Further, Dr. Dalton indicated that he was recommending knee surgery and attached a no-work order. Def.'s App. at 119–21.

Throughout the jurisdictional dispute, Spencer refused to return to Des Moines, and at no point in April, May, or June of 2007 did Spencer see Dr. Schulte as requested by Annett. Def.'s Facts ¶ 36. Additionally, during this time, Annett continuously sought medical records from Drs. Dalton and Bryan, but was unsuccessful. *Id.* ¶ 38. A month after Annett received Dr. Dalton's letter, on June 21, 2007, the Tennessee Workers' Compensation Specialist determined that Tennessee did not have jurisdiction over Spencer's claim due to Spencer's original employment contract. Def.'s App. at 122. Spencer did not appeal this decision, and there has since been no dispute that Iowa law controls the claim. Def.'s Facts ¶ 42. After the Tennessee Workers' Compensation decision, no one from Thomas's office called or attempted to contact Annett regarding Spencer's case. *Id.* ¶ 43. In fact, neither party had contact with the other between June 21 and July 23, 2007. Hr'g Tr. at 32–33.[6]

### D. *Spencer's Knee Surgery*

On July 23, 2007, a month after Tennessee rejected jurisdiction, Annett received a letter from Spencer's new (and current) attorney, Christopher Spaulding ("Spaulding"). Def.'s Facts ¶ 46. The letter stated that Spencer had retained Spaulding, and requested copies of any medical records that defense counsel might possess. *Id.* Spaulding sent a follow-up letter on August 9, 2007, requesting authorization for the knee surgery recommended by Dr. Dalton. *Id.* ¶ 47. On August 15, Annett replied that it had not received any medical records from Spencer's unauthorized physicians and that it required more information and additional time to investigate before it could decide whether to authorize the surgery. Def.'s App. at 177. The letter also requested that Spencer sign a patient waiver allowing doctors to release, and Annett to receive, medical records to determine whether to move forward with the surgery. Def.'s Facts ¶ 48.

In response to Annett's immediate refusal to authorize the surgery, Spencer filed an alternate medical care petition with the Iowa workers' compensation commissioner on August 24, 2007, requesting authorization for surgery with Dr. Dalton. Pl.'s Add'l Facts ¶ 52. That petition was eventually dismissed.[7] Def.'s Resp. to Pl.'s Statement of Add'l Material Facts ¶ 53. Spencer, however, filed a second petition for alternate medical care on September 10, again requesting the surgery. Pl.'s Add'l Facts ¶ 53. In contemplation of this petition, Annett sent a letter to Spencer's counsel on September 19, 2007. Def.'s Facts ¶ 49. The letter explained that while the change in Spencer's condition

Iowa, to include the Iowa Workers' Compensation Act, as amended." Def.'s App. at 126.

**6.** References to the Hearing Transcript are to the rough version of the Real Time transcript provided to the Court by the court reporter.

**7.** Neither party has indicated why this petition was dismissed.

between January and April was "fairly remarkable," if Spencer were willing to represent that the only known injury to his left knee was the alleged work injury on January 2, then Annett would authorize the surgery. *Id.* As part of this agreement, Annett agreed that Dr. Dalton would become Spencer's authorized physician. Def.'s App. at 197. Spencer responded five days later to confirm the parties' agreement that Annett would authorize the recommended surgery and pay healing-period benefits from the date of the surgery until the date that Spencer was allowed back to work or the doctor declared maximum medical improvement. *Id.* ¶ 50.

Annett authorized surgery on September 27, 2007. Pl.'s Add'l Facts ¶ 54. Dr. Dalton performed the surgery less than two weeks later, on October 5, 2007. Def.'s Facts ¶ 51. Following the surgery, Annett immediately began paying healing-period benefits; these benefits lasted until January 13, 2008, when Dr. Dalton authorized Spencer to return to work. *See* Def.'s App. at 400 (tracking Annett's payment records to Spencer); Def.'s Facts ¶ 69. After this date, Annett paid permanent partial disability benefits on a weekly basis until August 2008.[8] Def.'s App. at 400–01.

### E. *The Arbitration Petition and Eventual Settlement*

Following surgery, Spencer filed an arbitration petition with the workers' compensation commissioner on November 27, 2007. Def.'s Facts ¶ 54. He alleged injuries to his left knee, left foot, and bilateral hands. *Id.* Annett responded to this petition on December 7, questioning whether Spencer's injuries were causally related to the alleged fall on January 2, 2007. *Id.* ¶ 55. A hearing was set for November 6, 2008. Hr'g Tr. at 25.

Additionally, in December 2007, Spencer's counsel sent a letter to Annett asking about healing-period benefits from the time of Spencer's debilitating knee pain, in April of 2007, until the date of the surgery, October 2007. Def.'s Facts ¶ 56. Annett responded that it believed it did not owe benefits during this time period because it had not received records from an authorized doctor stating Spencer could not work and because Spencer did not inform Annett of his desire to seek additional care. *Id.* ¶ 57; Def.'s App. at 197. Neither Spencer nor his counsel inquired about the April–to–October healing-period benefits again until settlement negotiations in November of 2008. Def.'s Facts ¶ 58.

On January 14, 2008, Dr. Dalton cleared Spencer to return to work without restriction, but Spencer did not return to work at this time.[9] *Id.* ¶ 69; Def.'s App at 60. Just before he was to return to work, Spencer was involved in a car accident on March 7, 2008. Def.'s Facts ¶ 70. As a result of the accident, Spencer suffered "[c]ontusions up

---

8. Spencer's permanent partial disability was rated at 4%, which in Iowa corresponds to 20 weeks of additional compensation. Def.'s App. at 230, 232; *see* Iowa Code § 85.34(2)(u) ("In all cases of permanent partial disability other than those hereinabove described ... the compensation shall be paid during the number of weeks in relation to five hundred weeks as the disability bears to the body of the injured employee as a whole."). The Court is somewhat confused by the text of the settlement agreement explaining the basis for

permanent partial disability benefits as Iowa Code § 85.34(2)(*o* ) but calculating such benefits under § 85.34(2)(u). Def.'s App. at 230. Regardless, the apparent mistake plays no role in the resolution of the case.

9. Spencer had requested work, but Annett was not able to furnish any until mid-February. Def.'s App. at 60. By that time, Spencer had begun studying for a GED and wanted to finish the process before returning to work. *Id.*

and down both legs, seat belt marks, [and] air-bag marks." Def.'s App. at 95 (Spencer Dep. at 136–37). X-rays immediately following the accident showed no fractures, dislocations, or foreign bodies in Spencer's left knee. Def.'s Facts ¶ 71. Spencer informed Annett of this accident on March 17, 2008, but did not follow up with Annett over the next three weeks. Def.'s App. at 60; Pl.'s App. at 50. Due to his lack of communication, Annett placed Spencer on inactive status effective April 7, 2008. Pl.'s App. at 50.

No relevant events took place between March and November of 2008.[10] However, in contemplation of the workers' compensation action filed on November 27, 2007, the two parties began negotiating a settlement in November 2008. Def.'s Facts ¶ 58. On December 8, 2008, the parties reached a two-part settlement. *Id.* ¶ 59. They settled Spencer's bilateral carpal tunnel claim on a closed-file basis and Spencer's knee injury claim on an open-file basis. *Id.* As part of the settlement, Annett admitted liability for Spencer's knee injury. Def.'s App. at 230. In addition to a lump-sum payment, Annett agreed to pay all outstanding and future medical bills related to Spencer's knee injury. Def.'s Facts ¶ 60. In January of 2009, Annett complied with part of the settlement and paid the lump sum it owed to Spencer. Pl.'s App. at 51.

F. *Spencer's Various Petitions to the Iowa Workers' Compensation Commissioner Following Settlement, the State Bad Faith Case, and Meredith Landrum's Testimony*

Later in January 2009, Spencer's counsel sent a letter to Annett indicating that certain medical bills remained unpaid. Def.'s Facts ¶ 61. Specifically, the letter concerned a bill for $271.41 for pre-operative heart testing from DeKalb Community Hospital dated April 25, 2007. *Id.* Annett had first disputed this bill before the settlement agreement, claiming it was not related to Spencer's knee injury. *Id.* ¶ 62. Annett still refused the bill after Spencer's letter. *Id.*

In response, Spencer filed a petition for medical benefits with the workers' compensation commissioner on March 30, 2009, alleging that Annett "simply refuse[d] to pay work-related medical bills." Def.'s App. at 241. Annett filed an answer stating that all known medical bills related to the knee injury had been paid. Def.'s Facts ¶ 64. A hearing took place almost a year later, on March 23, 2010. Def.'s App. at 250. Deputy Commissioner Clair Cramer rejected the petition on jurisdictional grounds, opining that the necessity of paying such bills arose from the settlement agreement between the parties rather than from a workers' compensation case; thus, the workers' compensation commission did not have jurisdiction. Def.'s Facts ¶ 65. In his May 2010 arbitration ruling, however, Deputy Commissioner Cramer stated that if the workers' compensation commission did have jurisdiction, all bills would have to be paid in a timely manner.[11] Def.'s App. at 254. By

---

10. The record does not indicate what took place between these two dates—at oral argument, the Court asked about the gap, but Spencer gave little indication of what events took place. *See* Hr'g Tr. at 25. Additionally, Annett made no mention of what occurred during this gap. As a result, the Court will assume no relevant events occurred.

11. Presumably, Deputy Commissioner Cramer had intended a time period of "within 90

days of treatment or within 60 days of the invoice date, whichever is sooner." Def.'s App. at 252 (explaining that in the March 30, 2009 Petition for Medical Benefits "[a]n issue to be resolved is whether defendant should be ordered to pay claimant's future medical benefits relating to treatment of his left knee within 90 days of treatment or within 60 days of the invoice date, whichever is sooner").

the time the parties participated in the hearing, though, Annett had paid all but one outstanding bill.[12] Def.'s Supp. App. at 427–28 (Tr. of Arbitration Proceeding at 11–14) (Clerk's No. 26–3). Annett claims that the failure to pay the heart-testing bill after the settlement agreement was due to erroneous record-keeping that indicated Annett already had paid the bill.[13] Def.'s Facts ¶ 92; Pl.'s App. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Partial Summ. J. App.") at 143 (Clerk's Nos. 17.3–17.6).[14] Once it realized its mistake in July 2009, Annett paid the bill. Def.'s Facts ¶ 94; Pl.'s Partial Summ. J. App at 143.

Spencer, being discontent with the situation, filed a claim in the Iowa District Court for Polk County against Annett for various bad faith claims on July 9, 2009.[15] Mem. of Authorities in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 4 (Clerk's No. 21). While the state-court bad faith litigation progressed, Annett received a call from a former friend of Spencer and his wife, Meredith Landrum ("Landrum"). Def.'s Facts ¶ 66. This call took place on August 19, 2009. *Id.* Landrum claimed that Spencer had not injured himself falling off of his truck, but rather fell while walking out of a shed he used as a guitar shop at his home. *Id.* Landrum gave a recorded statement on March 25, 2010 reaffirming her story. *Id.* ¶ 67. As a result of Landrum's testimony, on September 8, 2010, Annett filed a counterclaim in the state bad faith case alleging fraud, unjust enrichment, money had and received, and restitution-mistake of fact, and requested actual damages, punitive damages, attorneys' fees, and interest. Pl.'s Second Supp.App. at 3–8 (Clerk's No. 50–1).

As part of the state-court proceedings, Annett filed a motion for summary judgment on December 21, 2009, similar to the one presently before the Court. *See* Pl.'s App. at 26–45. Judge Eliza Ovrom denied the motion in January 2011. *Id.* at 1–11. Thus, the parties set a trial date for August 2011. Def.'s Br. at 4. However, in late July 2011 and for unknown reasons, Spencer voluntarily dismissed the case and Annett, likewise, dismissed its counterclaims. Pl.'s App. at 107.

## G. Spencer's 2010 Alternate Medical Care Petitions and Request for a Total Knee Replacement[16]

In January 2010, while the state-court

---

12. This bill was for a date of service of March 2, 2010. Def.'s Supp.App. at 427 (Tr. of Arbitration Proceeding at 12).

13. Annett claims that this is the reason the bill was not paid earlier, and Spencer presents no evidence to the contrary. Annett points to the deposition of Martha Grice and the claim adjustor's notes—a resource cited by both parties—to assert a clerical error is the reason for the delay in payment. *See* Def.'s App. at 404, 407, 414; Pl.'s App. in Supp. for Mot. for Partial Summ. J. at 143. As a result, the Court will assume this fact is true for purposes of these motions.

14. Spencer's appendix filed in conjunction with his Partial Motion for Summary Judgment is made up of Clerk's Nos. 17.3 through 17.6. The appendix is consecutively paginated. Accordingly, the Court will not individually identify within which appendix portion each fact is located—the appendix will be cited as a whole.

15. Spencer alleged bad faith for the following reasons: "a. Refused to pay outstanding medical bills; b. Denied and delayed necessary medical care and treatment to Plaintiff Douglas Spencer; c. Denied and delayed healing period benefits to Plaintiff Douglas Spencer; d. Breached the settlement agreement approved by the Iowa Workers' Compensation Commissioner." Def.'s App. at 4.

16. At oral argument, the parties revealed that the bad-faith claim for failure to authorize the total knee replacement was going to be withdrawn. Hr'g Tr. at 13. Following oral argument, Spencer moved to dismiss the knee-replacement claim without prejudice. *See* Pl.'s Request for Dismissal Without Prejudice of Pl. Spencer's Bad Faith Claim Relating to

case was ongoing, Spencer complained about additional problems with his knee. Def.'s Facts ¶ 72. In response, Annett authorized an appointment with Dr. Dalton for early March 2010. *Id.* At the appointment, "Dr. Dalton diagnosed Spencer with 'degenerative arthropathy, left knee, worst medial compartment.'" *Id.* ¶ 73. Dr. Dalton recommended an injection to help with the knee and opined that a total knee replacement was going to be necessary within the next two to three years. *Id.* Soon after this appointment, in May 2010, Dr. Dalton retired and recommended Spencer see Dr. McClure, an orthopedic doctor practicing in Nashville. *Id.* ¶ 74; Def.'s App. at 366. Upon learning of Dr. Dalton's retirement, and despite knowing that Dr. Dalton had referred Spencer to a different doctor, Annett directed Spencer to Dr. Blake Garside, another Nashville doctor, to replace Dr. Dalton. Def.'s Facts ¶ 75; Def.'s App. at 367.

In response, Spencer filed an alternate medical care petition with the workers' compensation commissioner requesting that Dr. McClure be named as the authorized physician. Pl.'s Statement of Undisputed Material Facts ("Pl.'s Partial Summ. J. Facts") ¶ 7 (Clerk's No. 17.1). The Commissioner heard the case on June 10, 2010, and ruled in favor of Annett. *Id.* 9–11. At this hearing, Annett never contested liability, and liability was deemed admitted. *See* Pl.'s Partial Summ. J. App. at 27 ("Liability is admitted on this claim."). Indeed, to participate in an alternate medical care proceeding, liability must not be at issue. Iowa Admin. Code r. 876–48.7 ("Application cannot be filed under this rule if the liability of the employer is an issue."). Spencer filed for judicial review

of the Commissioner's decision on July 19, 2010. Pl.'s Partial Summ. J. Facts ¶ 11.

Dr. Garside saw Spencer on June 21 and again on July 21. Def.'s App. at 370–71. At these two appointments, Dr. Garside indicated that while non-operative treatment might help, potential operative treatment would include a complete knee replacement. *Id.* Following these appointments, Spencer chose to continue with non-operative measures. Def.'s App. at 371.

On August 11, 2010, however, Spencer changed his mind regarding treatment and asked Annett, through counsel, to authorize a total knee replacement. *Id.* at 372. Annett ignored the request and Spencer petitioned for alternate medical care seeking authorization for a total knee replacement. Def.'s App. in Supp. of Its Resistance to Pl.'s Mot. for Partial Summ. J. ("Def.'s Partial Summ. J. App.") at 3, 20 (Clerk's No. 23.3). Annett answered the petition and contested liability for the injury. *Id.* at 14–15. It argued that no medical opinion showed the knee replacement was reasonable and necessary or stated that the injury was causally related to the alleged work injury in January 2007. *Id.* In its answer, Annett never mentioned Landrum's testimony. *Id.* Indeed, at oral argument, Annett asserted its denial of liability for the total knee replacement surgery was in no way related to Landrum's statements; rather, it was due to questions of causation. Hr'g Tr. at 40. As a result of the contested liability, the workers' compensation commissioner dismissed Spencer's claim on September 3, 2010. Def.'s Partial Summ. J. App. at 16. The deputy commissioner explained that since Annett now contested liability, it could no longer

Paragraph 9(e) (Clerk's No. 56). Annett resisted this motion, however, and asked the Court to instead decide the question in its summary judgment decision due to Spencer's

admission at oral argument that the knee-replacement claim is fairly debatable. *See* Resp. to Mot. to Dismiss Without Prejudice ¶ 3 (Clerk's No. 63).

direct Spencer's medical care and Annett was foreclosed from asserting a lack-of-authorization defense if a claim was made for reimbursement of medical expenses. *Id.*

Meanwhile, Annett had continued to seek information from Landrum about her claim that Spencer fell at his home rather than off his truck. On October 7, 2010, Landrum signed and notarized her recorded statement given March 25, 2010. Def.'s Facts ¶¶ 67–68. Annett then sent a "1-inch stack of medical records" to Dr. Schulte and sought an opinion from him as to whether Spencer's total knee replacement was necessary and causally related to the alleged work injury on January 2, 2007. Def.'s Facts ¶ 78; Def.'s App. at 378. Dr. Schulte responded on December 17, 2010 that if Spencer had a fall like the one described by Landrum, the cause of his injuries more than likely would be a result of that fall in conjunction with Spencer's underlying left knee degenerative arthritis. Def.'s Facts ¶ 79; Def.'s App. at 378.

Shortly after receiving Dr. Schulte's report, Annett informed Spencer's counsel by letter dated January 26, 2011 that it was disputing liability and would refuse to authorize any additional care. Def.'s Facts ¶ 80. About six months after this denial of liability, on July 29, 2011, Spencer filed a review-reopening petition with the workers' compensation commissioner. Pl.'s Partial Summ. J. Facts ¶ 19. Annett responded on August 16 by denying liability for the injury and questioning whether the injury occurred. *Id.* ¶ 20.

Despite relinquishing control of Spencer's care by denying liability for the alleged work injury in September 2010 and continuously denying liability since this time, Annett continued to participate in the appeals process of the June 2010 alternate medical care proceeding.[17] *Id.* ¶¶ 11–17. Iowa District Court Judge Karen Romano granted Spencer's July 2010 Petition for Judicial Review and heard the case on May 20, 2011. *Id.* ¶¶ 12–13. Judge Romano reversed the workers' compensation commissioner's ruling, and Annett appealed Judge Romano's decision on July 1, 2011. *Id.* ¶ 14. On March 28, 2012, the Iowa Court of Appeals ruled in favor of Annett by reversing the district court and reinstating the workers' compensation commissioner's ruling. *Id.* ¶ 15. The Court of Appeals, however, premised its ruling on the idea that "[t]he facts are not in dispute[, and that] Douglas Spencer sustained a work-related injury." Pl.'s Partial Summ. J. App. at 43 (quoting *Spencer v. Annett Holdings, Inc.*, No. 11–1032, 815 N.W.2d 410, 2012 WL 1058205 at *1 (Iowa Ct.App. Mar. 28, 2012)). Spencer then filed a Petition for Further Review with the Iowa Supreme Court, and Annett resisted. Pl.'s Partial Summ. J. Facts ¶¶ 16–17. Eventually, the Iowa Supreme Court denied further review. Hr'g Tr. at 5.

## II. STANDARD FOR SUMMARY JUDGMENT

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[18] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and

---

**17.** In this proceeding, Spencer had petitioned to see Dr. McClure rather than Annett's choice of Dr. Garside.

**18.** Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[19] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of*

---

**19.** Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

*Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed. 1998)).

## III. LAW AND ANALYSIS

In his Amended Complaint, Spencer alleges that Annett acted in bad faith by: 1) "refus[ing] to pay outstanding medical bills"; 2) "Den[ying] and Delay[ing] necessary medical care and treatment to [Spencer]"; 3) "Den[ying] and Delay[ing] healing period benefits to [Spencer]"; 4) "Breach[ing] the settlement agreement approved by the Iowa Workers' Compensation Commissioner"; and 5) "Specifically den[ying] and delay[ing] left total knee replacement surgery recommended by the authorized treating surgeon selected by Defendant ...." Compl. ¶¶ 9a-e. (Clerk's No. 9). Annett filed an Answer to Spencer's Amended Complaint and asserted counterclaims for fraudulent misrepresentation, unjust enrichment, money had and received, and restitution-mistake of fact. Clerk's No. 11 at 1–3.

On June 1, 2012, both parties moved for summary judgment. Annett claims that it is entitled to summary judgment on all of Plaintiff's bad faith claims, arguing: 1) many of Spencer's asserted causes of action are not recognized under Iowa law; and 2) those claims that are cognizable concern situations in which Annett had a reasonable basis for denying or delaying care, thus making the claims fairly debatable as a matter of law. *See generally* Clerk's No. 18. Spencer, by contrast, seeks only partial summary judgment on the issue of liability.[20] *See* Clerk's No. 17.

---

**20.** For purposes of this motion, the Court considers "liability" only to mean that Spenc-

er injured his knee at work. The Court re-

Specifically, Spencer claims that, because Annett participated in the June 2010 alternate medical care proceeding *and* in the later appeals of that proceeding, Annett should be prohibited from contesting liability under a theory of judicial estoppel. *See* Pl.'s Br. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Br.") at 7–8 (Clerk's No. 17.2) ("[T]he doctrine of judicial estoppel prohibits the Defendant from now denying liability.... [U]pon finding that Defendant is barred from denying liability, Plaintiff requests that the Court dismiss all of Defendant's counterclaims as they are based on a denial of liability."). The Court will address each Motion in turn.[21]

### A. *Annett's Motion for Summary Judgment*

Annett asserts in its Motion for Summary Judgment that Spencer's bad faith claims fail for two reasons. First, it contends many of the actions for which Spencer is alleging bad faith are not recognized under Iowa law. Second, to the extent that any of the bad faith claims are recognized by Iowa law, Annett argues that it did not act in bad faith because Spencer's claims were fairly debatable. Spencer responds that his claims are recognized by Iowa law and that Annett had no reasonable basis to deny or delay any medical care or benefits following Spencer's knee injury. Further, he argues that the law-of-the-case doctrine applies and prevents the Court from considering Annett's motion because the state-court judge in the previous bad faith action considered and denied the motion.

### 1. *An overview of bad faith.*

First-party bad faith is an intentional tort that arises in the insurance context due to a defendant's " 'knowing failure to exercise an honest and informed judgment' " when an insured seeks compensation for an injury. *McIlravy v. N. River Ins. Co.*, 653 N.W.2d 323, 329 (Iowa 2002) (quoting *Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 12 (Iowa 1990)). It applies to all insurers regardless of the origin of the case, and includes self-insured employers. *McIlravy*, 653 N.W.2d at 329 ("The two-part test for first-party bad faith applies no matter what type of insurance is provided by the defendant insurer, including workers' compensation."); *Reedy v. White Consol. Indus., Inc.*, 503 N.W.2d 601, 603 (Iowa 1993) ("For the purposes of a bad faith tort claim, we see no distinction between a workers' compensation insurance carrier for an employer and an employer who voluntarily assumes self-insured status ...."); *see also Boylan v. Am. Motorists Ins. Co.*, 489 N.W.2d 742, 744 (Iowa 1992) ("[R]ecognition of tort liability on the part of workers' compensation insurance carriers guilty of the type of bad faith conduct ... recognized in *Dolan* is a logical extension of that decision."); *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988) ("We conclude it is appropriate to recognize the first-party bad faith tort to provide the insured an adequate remedy for an insurer's wrongful conduct.").

In the workers' compensation context, however, the tort has its limits. *See Petrillo v. Lumbermens Mut. Cas. Co.*, 378 F.3d 767, 770 (8th Cir.2004) (explaining

---

fuses to read in a "causation" aspect of liability for all of Spencer's injuries. In other words, Annett could still challenge the necessity of medical care by questioning whether an injury is causally related to the alleged fall on January 2, 2007.

21. Because jurisdiction in this case is premised on the diversity of the parties, Iowa law governs the dispute. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State.").

that no bad faith claim can survive on the basis of an employee who is merely dissatisfied with care); *Kloster v. Hormel Foods Corp.*, 612 N.W.2d 772, 774–75 (Iowa 2000) (denying district court jurisdiction where a plaintiff has not yet exhausted or pursued all agency remedies first); *White v. Nw. Bell Telephone Co.*, 514 N.W.2d 70, 77 (Iowa 1994) (prohibiting a finding of first-party bad faith where a party breached a workers' compensation settlement agreement); *Harned v. Farmland Foods, Inc.*, 331 N.W.2d 98, 101 (Iowa 1983) (holding that where a party is dissatisfied with care, the proper forum is the workers' compensation commission); *Good v. Tyson Foods, Inc.*, 756 N.W.2d 42, 45 (Iowa Ct. App.2008) ("Claims of dissatisfaction with care, including claims of failure to provide requested care, come under workers' compensation law."). Indeed, due to the nature and the goals of the workers' compensation division, almost all work-injury cases fall within the ambit of the so-called exclusivity principle embodied in Iowa Code § 85.20, which provides that "[t]he rights and remedies provided in this chapter ... shall be the exclusive and only rights and remedies of the employee ... against ... the employee's employer." Thus, for the mine run of workers' compensation cases, a district court will only hear those cases in which the parties have exhausted all administrative remedies. *See Kloster*, 612 N.W.2d at 774–75. Because federal district courts are courts of limited jurisdiction and the legislature has generally given the workers' compensation commissioner jurisdiction over work-injury cases, a district court must first ask itself whether a case falls within one of the limited exceptions to the general exclusivity principle.

 Assuming that the case falls outside the workers' compensation exclusivity principle, a district court has jurisdiction to hear a first-party bad faith case. *See McIlravy*, 653 N.W.2d at 328–29 ("[A] method by which a ... workers' compensation carrier may be penalized ... is by a private cause of action for first-party bad faith."). To prevail on a claim for bad faith, a plaintiff must prove by substantial evidence: "1) that the insurer had no reasonable basis for denying benefits under the policy and, 2) the insurer knew, or had reason to know, that its denial was without basis." *Id.* at 329 (quoting *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 657 (Iowa 2002)) (internal quotation marks omitted). "The first element is an objective one; the second element is subjective." *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005) (citing *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 251 (Iowa 1991)).

 A defendant can show a reasonable basis for denying benefits and thus disprove the first element of bad faith by showing that a claim for benefits is objectively "fairly debatable." *Rodda v. Vermeer Mfg.*, 734 N.W.2d 480, 483 (Iowa 2007). Whether a claim is fairly debatable is a question of law that a court usually can answer. *Id.* To determine whether a claim is fairly debatable, the Court must examine the claim to determine if it is " 'open to dispute on any logical basis.' " *Id.* (quoting *Bellville*, 702 N.W.2d at 473). Whether an insurer's position actually lacks merit is insufficient to prove the first element of bad faith. *Bellville*, 702 N.W.2d at 473. Instead, "[t]he focus is on the existence of a debatable issue, not on which party was correct." *Id.* Thus, when considering conflicting evidence, the Court should not weigh the evidence; rather it should " 'decide whether evidence existed to justify denial of [a] claim.' " *Id.* at 474 (quoting *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 285 (Tex.App.1992)). If the court concludes that there exists a reasonable basis for denying benefits, summary judgment is appropriate because "where an objectively reasonable basis for

denial of a claim actually exists, the insurer cannot be held liable for bad faith as a matter of law," and the bad faith causes of action should be dismissed. *Id.* at 473–74 (quoting *Gardner v. Hartford Ins. Accident & Indem. Co.*, 659 N.W.2d 198, 206 (Iowa 2003)) (internal quotation marks omitted). Assuming a plaintiff proves the first, objective element of bad faith, he still must demonstrate the second, subjective element—that the defendant knew or had reason to know that it lacked a reasonable basis for denying benefits. *Rodda*, 734 N.W.2d at 483. If a plaintiff fails to show either of these elements, the claim will fail. *See id.*

With this framework in mind, the Court turns to analysis of Annett's Motion for Summary Judgment. It begins by evaluating Spencer's law-of-the-case argument. The Court then will examine each of Spencer's bad faith claims. For each claim, the Court will determine whether such claim is cognizable under Iowa law and, if so, whether the claim is fairly debatable as a matter of law.

### 2. The law of the case doctrine.

The law of the case doctrine in its most basic form states that "a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation." *Suel v. Sec'y of Health & Human Servs.*, 192 F.3d 981, 985 (Fed.Cir.1999); *see also State v. Grosvenor*, 402 N.W.2d 402, 405 (Iowa 1987) ("The doctrine of the law of the case represents the practice of courts to refuse to reconsider what has once been decided."). In Iowa, the law of the case doctrine focuses on appellate decisions and posits that "an appellate decision becomes the law of the case and is controlling on ... the trial court." *Bahl v. City of Asbury*, 725 N.W.2d 317, 321 (Iowa 2006). Many Iowa decisions have interpreted the law of the case doctrine in the same way—that appellate court decisions are final. *See, e.g., City of Okoboji v. Iowa Dist. Ct. for Dickinson Cnty.*, 744 N.W.2d 327, 331 (Iowa 2008) ("It is a fundamental rule of law that a trial court is required to honor and respect the rulings and mandates by appellate courts in a case."); *Grosvenor*, 402 N.W.2d at 405 ("It is a rule which provides that the legal principles announced ... by a reviewing court in an opinion, right or wrong, are binding throughout further progress of the case ...."). In other words, a "downward mandate" from a higher court, regardless of its correctness, applies throughout the duration of the case. *Grosvenor*, 402 N.W.2d at 405; *see Okoboji*, 744 N.W.2d at 331–32.

This principle, however, is limited and "is not applicable ... if the facts before the court upon the second trial are materially different than the first." *Grosvenor*, 402 N.W.2d at 405. Likewise, if issues are raised in the second case that were not litigated in the first, the doctrine does not apply. *See id.* ("[T]he doctrine does not preclude consideration of issues that ... were not[ ] raised in the first appeal."); *see also Okoboji*, 744 N.W.2d at 331 ("The first task of the district court ... is to determine the precise action directed to be done by the appellate court."); *Winnebago Indus., Inc. v. Haverly*, 727 N.W.2d 567, 573 (Iowa 2006) (prohibiting application of the law of the case doctrine where the issue was not decided in the previous case). Thus, under Iowa law, various courts have only applied the doctrine when: 1) a trial court is implementing a ruling of an appellate court, 2) the facts of the case are substantially the same, and 3) the issues were the same.

When dealing with a more "horizontal" challenge—a challenge in which a party seeks to implement a ruling from one trial court to another—Iowa law seems to be silent.[22] The same cannot be said of feder-

---

**22.** Indeed, Spencer fails to cite a single case applying the law of the case doctrine from

al jurisprudence; in federal court, the doctrine has a more defined presence. As Annett aptly points out in its Reply Brief (Clerk's No. 27 at 5), the law of the case doctrine applies differently depending on context; the doctrine "is applied more or less strictly depending on the circumstances of the case." *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 839 F.2d 1544, 1550 (Fed.Cir.1988). "At the trial level ... the law of the case is little more than a management practice to permit logical progression toward judgment. Orderly and efficient case administration suggests that questions once decided not be subject to continued argument, but the court has the *power to reconsider its decisions until a judgment is entered.*" *Id.* (emphasis added). District courts in the Eighth Circuit have adopted this rule. *See Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 299 F.Supp.2d 903, 911–12 (N.D.Iowa 2004) (quoting the above portion of *Jamesbury* ). Judge Bennett further explained in Dethmers:

> "On a renewed motion for summary judgment before a second judge, the district court must balance the need for finality against the forcefulness of any new evidence and the demands of justice. *With respect to non-appealable denial of summary judgment, the law of the case is not a limit on the court's jurisdiction, but a rule of practice which may be departed from in the sound discretion of the district court. The first judge always has the power to change a ruling* .... *A fortiori*, if the first judge can change his mind after denying summary judgment, and change his ruling, a second judge should have

and does have the power to do so as well."

*Id.* at 912 (quoting *Corporacion de Mercadeo Agricola v. Mellon Bank Int'l*, 608 F.2d 43, 48 (2d Cir.1979)). As Judge Bennett summarized, "the standard for reconsideration of a prior summary judgment ruling by the trial court—at least in the absence of an intervening appeal—is quite generous." *Id.* Additionally, Judge MacLaughlin, writing for the United States District Court for the District of Minnesota, explained the "horizontal" concept two years before *Jamesbury* was decided. In *Paulson v. Greyhound Lines, Inc.*, Judge MacLaughlin commented, "[t]he doctrine of the law of the case has less force at the trial court level." 628 F.Supp. 888, 891 (D.Minn.1986). In discussing summary judgments, he continued, "[o]ne judge denying a summary judgment motion does not preclude a successor judge from granting it. A successor judge has the same discretion to reconsider a ruling as the first judge would." *Id.* (internal citations omitted).

██ Spencer contends that this Court should reject Annett's motion under the law of the case doctrine. He asserts that since a judge considered and denied a substantially similar motion during the state-court bad faith case, this Court should prohibit Annett from succeeding on its Motion for Summary Judgment. Pl.'s Resp. Br. at 6–7. The Court disagrees with Spencer's argument for two reasons. First, the summary judgment in question, although similar, is not so substantially similar as to implicate the law of the case doctrine. The motion presently before this Court concerns additional causes of action, additional arguments, additional case citations, and additional facts.[23] *See*

one trial court to another trial court—he relies solely on decisions dealing with an appellate court's decision applying to a lower court. *See* Pl.'s Resp. Br. at 6–7.

**23.** The Court appreciates the fact that Plaintiff has attempted to voluntarily dismiss an

additional cause of action—a bad-faith claim for a total knee replacement. *See* Mot. to Dismiss Without Prejudice (Clerk's No. 56). Regardless, dismissal would not sway the Court. The mere length of the briefs in support of summary judgment is telling and sug-

*Grosvenor*, 402 N.W.2d at 405 (refusing to apply the law of the case doctrine where a party offered additional facts that varied from the court of appeals ruling). As Annett correctly points out, many of the issues at play in the state court summary judgment proceeding have changed and were not previously litigated.

Second, even assuming that the motions were identical, federal precedent dictates that a subsequent trial court is not bound by a former trial court where the former court did not reach the merits of the case. *See Paulson*, 628 F.Supp. at 891. As applied in Iowa, the doctrine only covers trial courts considering issues on remand from appellate courts. Indeed, even those decisions cited by Spencer in the present case apply the doctrine only from an appellate court to a trial court or other lower court. Spencer fails to reveal any Iowa case law in support of his argument that the law of the case doctrine should operate in the horizontal direction he claims. At best, Spencer suggests that this Court could choose to apply the doctrine, but presents no authority that this Court must apply the doctrine. The Court declines Spencer's invitation to adopt Judge Ovrom's ruling, and will consider all summary judgment arguments de novo.

3. *Spencer's claim that Annett refused to pay outstanding medical bills and breached the settlement agreement.*

■ Spencer's first bad faith claim is that Annett failed to pay outstanding medical bills related to his knee injury pursuant to the settlement agreement signed in December 2008. *See* Am. Compl. ¶ 9a.

Spencer separately alleges that Annett breached the settlement agreement in bad faith. *Id.* ¶ 9c. Deputy Commissioner Cramer correctly found in his March 2010 ruling that any duty to pay for past or ongoing medical care arises out of the settlement agreement between the parties. Def.'s App. at 252. Indeed, Spencer admits so in his brief. Pl.'s Br. at 12 ("Simply put, Annett knowingly failed to pay numerous medical bills related to Spencer's authorized surgery in direct violation of the settlement agreement.").[24] Accordingly, the Court finds that these two claims are substantially the same, and it would be prudent to consider them together.

a. *Is a bad faith claim based on the breach of a settlement agreement cognizable?*

■ The first question the Court must consider . is the threshold question of whether the claim is cognizable under Iowa law. To answer this question in a breach-of-settlement context, the Court must contemplate the rationale behind the first-party bad faith tort. An important reason that Iowa adopted the tort of first-party bad faith was due to "the inherently unequal bargaining power between the insurer and the insured." *Dolan*, 431 N.W.2d at 794; *see White*, 514 N.W.2d at 77 (recognizing that the bad faith tort is recognized in insurance contracts and the reason for the tort involves unequal bargaining power); *Boylan*, 489 N.W.2d at 744 (Iowa 1992) ("[R]ecognition of tort liability on the part of workers' compensation insurance carriers guilty of the type of bad faith conduct ... recognized in *Dolan* is a

gests that additional arguments have been made. Annett's state-court brief barely reaches eighteen pages, whereas the current brief covers a full fifty-one pages. Pl.'s App. at 28–45; Def.'s Br. in Supp. of Its Mot. for Summ. J.

24. Spencer merely claims that a bad faith breach of the settlement contract is cognizable under Iowa law. He does not, however, explain to the court *how* Annett breached the agreement in any way, save for failure to pay for bills in a timely fashion. *See* Pl.'s Resp. Br. at 10–12.

logical extension of that decision."). As the Iowa Supreme Court explained, "[r]ecognition of the first-party bad faith tort addresses this inequality." *Dolan*, 431 N.W.2d at 794. Annett responds that a bad faith claim for breach of a settlement agreement does not address the same policy concerns and asserts that such a claim is not recognized under Iowa law due to the Iowa Supreme Court's holding in *White*, 514 N.W.2d at 70.

Unlike *Dolan* or *Boylan*, *White* concerned an insurance carrier's breach of a settlement agreement following an industrial-commission-approved settlement in which both parties were represented by counsel. *White*, 514 N.W.2d at 72. This agreed-upon settlement stood in stark contrast to the contracts of adhesion generally found in the insurance context. *Id.* at 77. The plaintiff in the case had sued the self-insured employer requesting punitive damages for breach of a settlement agreement. *Id.* at 74. Under Iowa law, a party can only recover punitive damages for a breach of a contract if two elements are met: "1) that the breach also constitutes an intentional tort and 2) that the breach was committed maliciously, in a manner meeting the standards of section 668A.1 [, the Iowa Code section describing punitive damages]." *Id.* at 77. The trial court presumably accepted that the underlying intentional tort was a claim for bad faith. *Id.* ("The court's first ground appears to be based on a finding of bad faith on the part of U.S. West."). The Iowa Supreme Court, however, rejected this argument and held that the policy reasons behind a bad faith tort for insurance carriers—unequal bargaining power between the parties—did not apply in a breach-of-settlement-agreement claim, and thus the plaintiff did not prove that an intentional tort occurred. *Id.* ("This agreement resulted from negotiations between U.S. West and White, who was represented throughout by counsel.... Thus the con-

cerns expressed in *Dolan* regarding unequal bargaining power are not implicated."). Although the defendant likely breached the settlement agreement, "its conduct furnished no basis for an intentional tort claim premised on insurer bad faith." *Id.*

As *White* recognized, when two parties have entered into an agreement through counsel, the concerns surrounding insurance contracts are not in play; thus, bad faith is not cognizable. *Id.; see Pool v. Orkin, Inc.*, No. 3:09–cv–91, 2010 WL 5452712, at *9–10 (S.D.Iowa Aug. 30, 2010) (declining to extend bad faith outside the insurance context). The circumstances in *White* are sufficiently similar to the present case to apply the Iowa Supreme Court's reasoning. Spencer's claims arise from the breach of a settlement agreement in which counsel represented both parties. Therefore, like the contract in *White*, the settlement agreement does not involve the same unequal bargaining circumstances present in an insurance context. As a result, the Court finds that a bad faith claim for breach of a contractual settlement agreement between two represented parties is not cognizable under Iowa law. Thus, Annett is entitled to summary judgment on any of Plaintiff's claims arising out of breach of the settlement agreement.

### b. *Bad faith delay of payments.*

Even assuming that the breach of settlement agreement bad faith claim is cognizable under Iowa law, the Court agrees with Annett that Spencer's claims in that regard fail as a matter of law. As described above, to succeed on a bad faith claim, a party must show both that there was no reasonable basis for denying or delaying benefits and that the party knew or should have known there was no reasonable basis for denying benefits. While Annett admits that certain bills may not have been paid

in a timely fashion, it asserts that it had a reasonable basis for denying payments or was unaware that no reasonable basis existed for delaying such payments.

Spencer alleges Annett "simply refuse[d] to pay work-related medical bills."[25] Pl.'s Br. at 11. Annett admits that some bills were not paid promptly, but asserts that a clerical error was the cause for denying payments, and Annett has since paid all medical bills related to the knee injury.[26] Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 31 (Clerk's No. 21). In a motion for summary judgment, the moving party bears the initial burden to demonstrate to the court the absence of any genuine issues of material facts. See Celotex, 477 U.S. at 323, 106 S.Ct. 2548; Anderson, 477 U.S. at 248, 106 S.Ct. 2505. After making such a showing, the burden then shifts to the nonmoving party to demonstrate facts beyond its original pleadings to show the Court a genuine issue of material fact exists that a trial must resolve. See Fed. R.Civ.P. 56(c). Further, when considering a motion for summary judgment, the Court must consider all inferences in the light most favorable to the nonmoving party. See Fed.R.Civ.P. 56(a); Harlston, 37 F.3d at 382. This does not mean, however, that a party can fabricate a material fact solely by means of disagreeing with the other party—"[i]t must have a real basis in the record." Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir.1992) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

■ In the present case, Spencer does little more than disagree with Annett's conclusions as to why Annett delayed paying certain bills. It fails to point to any facts in the record that would contradict or rebut Annett's account that clerical errors led to the delayed payments. Therefore, this Court is bound to accept Annett's characterization of the circumstances surrounding the delayed payment of bills. Accepting Annett's uncontested assertion of a clerical error, the question then becomes: Did these clerical errors provide a reasonable basis for delaying payment of medical bills and did Annett know or have reason to know that no reasonable basis for delaying payments existed?

The Court finds that Annett's internal review and inaccurate records provides a reasonable basis for Annett's delay in paying medical bills. Even assuming that Annett had no objective basis to delay the payment of the bills, the Court finds that Annett neither knew nor had reason to know that such a delay was unreasonable under the circumstances. Further, once discovered, Annett paid the medical bills promptly. A good-faith belief that all bills had been paid along with Annett's promptly paying the bills once the mistake was discovered is sufficient to absolve Annett from liability on Plaintiff's claim of bad faith.

---

**25.** Spencer does not indicate specifically which bills he believes Annett refused to pay, or paid in an untimely fashion. However, from Annett's standpoint, the following bills formed the basis of the allegation: 1) a pre-operation heart-testing bill from April 25, 2007; 2) a bill related to a pill-swallowing incident from October 24, 2007; and 3) a bill related to unnamed services provided on June 12, 2007. See Def.'s Br. at 31–33.

**26.** Annett explains in its brief that Spencer's bills were forwarded to a bill review provider rather than to Annett, and the provider denied some bills incorrectly. Def.'s Br. at 33. Further, Annett asserts that its records showed bills paid when they were not in fact paid. Id. Upon discovery of the various mistakes, Annett promptly paid the outstanding bills. Id.

4. *Spencer's claim that Annett failed to provide medical care.*

Spencer next alleges that Annett, in bad faith, denied and delayed necessary medical care to Spencer between April 2007, when Spencer first went to Dr. Dalton, and October 2007, when Spencer underwent arthroscopic surgery. Annett's response is two-fold. First, it claims that the workers' compensation exclusivity principle embodied in Iowa Code § 85.20 prohibits the district court from hearing this case. Second, and in the alternative, Annett claims that any delay was reasonable given that the claim was fairly debatable.

a. *Is the claim cognizable under Iowa law?*

Annett argues that Spencer's claim is one for dissatisfaction with medical care, and as a result, it should be heard by the workers' compensation commissioner under the exclusivity principle embodied in Iowa Code § 85.20 and existing Iowa precedent. *See* Def.'s Br. at 36. Spencer responds that the claim is not one for dissatisfaction with medical care, but rather is a claim for failure to provide medical care, and thus is distinguishable from Iowa precedent. *See* Pl.'s Resp. Br. at 14–15.

Both parties agree that, prior to bringing a claim in the district court for dissatisfaction with medical care, a party must first exhaust all agency remedies. *See* Def.'s Br. at 36 ("A claim alleging dissatisfaction of medical treatment falls under the exclusivity provision."); Pl.'s Resp. Br. at 14–15 (distinguishing Spencer's case from Iowa precedent and explaining that one reason for the distinction is that "the plaintiff [in the precedential case] was not denied medical benefits but was dissatisfied with the benefits being given by the insurance company" and in another precedential case "the plaintiff was provided medical care and treatment but was dissat-

isfied apparently with the treatment being offered. In the case at bar, we have a refusal to provide treatment"). Indeed, Iowa law dictates that the proper remedy for dissatisfaction with medical care is through the workers' compensation commissioner, not in a district court. Iowa Code § 85.27(4); *see Petrillo v. Lumbermens Mut. Cas. Co.*, 378 F.3d 767, 770 (8th Cir.2004); *Kloster*, 612 N.W.2d at 774–75; *Harned*, 331 N.W.2d at 101; *Good*, 756 N.W.2d at 45. The issues before the Court, then, are: 1) whether the circumstances of the present case indicate a claim of failure to provide medical care or merely a claim for dissatisfaction with medical care; and 2) if the present case gives rise to a claim for failure to provide care, whether a bad faith cause of action for failure to provide care is recognized under Iowa law. Because a brief review of Iowa precedent leads it to conclude that the present case is properly characterized as a claim for dissatisfaction with medical care, the Court will not reach a conclusion on the second issue.

In *Harned*, the plaintiff-employee injured his back while at work. 331 N.W.2d at 99. The plaintiff requested chiropractic care, but the defendant-employer denied this request and instead elected non-chiropractic methods. *Id.* at 99, 101. The Iowa Supreme Court affirmed the defendant's motion to dismiss, reasoning that any claim for dissatisfaction of medical care, including not providing care suggested by the employee, belongs in the workers' compensation commission. *Id.* at 99–100.

In *Kloster*, the court ruled that a plaintiff must first exhaust all administrative remedies before asking a district court to consider a claim for dissatisfaction with care. 612 N.W.2d at 775. The *Kloster* plaintiff was receiving care, but believed that his employer was attempting to have his doctor "define his injury in a manner

that would permit the company to avoid filing 'lost time' reports with state and federal agencies." *Id.* at 773. As a result, the plaintiff brought claims of "improper interference with medical care and retaliatory discharge." *Id.* The Iowa Supreme Court ruled that the district court did not have jurisdiction, that the case "f[ell] squarely within the ambit of chapter 85," and that it should be characterized as a claim for dissatisfaction with medical care. *Id.* at 774–75. It reasoned that although the plaintiff was receiving care, the care may have been unreasonable in light of the alleged collusion of the employer and the doctor. *Id.* at 775. Because Iowa Code § 85.27 dictates that the proper remedy for unreasonable care lies with the workers' compensation commission, the plaintiff's failure to exhaust agency remedies led to the dismissal of his claim. *Id.*

*Good* offers analogous results to the previous cases, but expands "dissatisfaction" to include disagreements about the promptness of care. 756 N.W.2d at 45–46 ("If the employer does not offer prompt medical treatment, the workers' compensation commissioner may order alternate care." (citing *R.R. Donnelly & Sons v. Barnett*, 670 N.W.2d 190, 195 (Iowa 2003))). The plaintiff in *Good* made claim against her employer for negligence and "alleged the defendants' refusal to provide medical care breached their duty of good faith." *Id.* at 44. The case arose after the employee was injured when a hog carcass fell on her arm. *Id.* Despite the plaintiff's protestations, the employer repeatedly sent her to the plant nurse rather than to an outside physician. *Id.* More than three weeks had passed before the employer finally allowed the employee to see an out-

side physician. *Id.* The Iowa Court of Appeals affirmed the district court's grant of summary judgment in the case, reasoning that any dissatisfaction with medical treatment—even dissatisfaction based on failure to provide "prompt care" or "requested care"—falls within the ambit of the workers' compensation commission, and § 85.27(4) provides the appropriate remedy. *Id.* at 46.

 Spencer argues that none of these cases applies because: 1) this case deals with a failure to provide medical care rather than mere dissatisfaction, and 2) this case raises a cause of action, "bad faith," that is nominally different than the causes of action in the other cases.[27] Pl.'s Resp. Br. at 14–15. The Court finds no merit in either of Spencer's contentions. First, the Court sees no distinction between *Harned*, *Kloster*, *Good*, and the present case insofar as all four involve dissatisfaction with the care provided. Immediately following Spencer's injury, Spencer sought medical care, and Annett authorized such care with Dr. Walker. Def.'s Facts ¶ 7. Annett then provided follow-up care with Dr. Schulte a week later, on January 11, 2007. *Id.* ¶ 9. When Spencer began experiencing further pain and sought unauthorized medical treatment, Annett offered to authorize surgery if Spencer would return to see Dr. Schulte. *Id.* ¶ 35. Spencer was then dissatisfied with this care, and believed it to be unreasonable. *See* Pl.'s Resp. Br. at 19 (claiming that requiring Spencer to return to Iowa was illegal).

It is certain from the cases cited above that care was being provided; Spencer had been to two doctor's appointments, and

27. Additionally, Spencer argues that the *Harned* case is inapplicable because it was decided nine years before the bad-faith tort was recognized in *Boylan*. Pl.'s Resp. Br. at 15. However, Spencer offers no case law demonstrating that the court should ignore the case. Indeed, following *Boylan*, multiple cases have relied on *Harned's* reasoning, and the Court sees no reason to discount its authority. *See, e.g., Kloster*, 612 N.W.2d at 775; *Good*, 756 N.W.2d at 46.

Annett offered a third appointment with Dr. Schulte if Spencer desired. Def.'s Facts ¶ 35. Spencer was receiving some treatment, but turned down additional treatment that he thought unreasonable, and failed to file an alternate medical care petition before the workers' compensation commission. Like the plaintiffs in *Harned, Kloster,* and *Good,* Spencer was merely dissatisfied with his care. Even accepting that Annett was delaying Spencer's care, *Good* makes clear that even "where an employee was denied medical care for a period of time," and an "employer does not offer prompt medical treatment," the Iowa Supreme Court will still view it as "dissatisfaction with care." 756 N.W.2d at 45–46. Regardless of the basis for the dissatisfaction, the district court lacks jurisdiction over the claim, and the proper venue is with the workers' compensation commission.

Second, the Court finds no merit in Spencer's contention that the nominal characterization of the claims in the previous cases makes them inapplicable to the present case. Spencer alleges that because *Kloster* dealt with "intentional interference" and because *Good* was framed as a "gross negligence" case, that neither one is applicable to the case at hand. Although not directly on point with the specific type of claim, Spencer provides no reason for the Court to discount the logic behind the cases. Indeed, the types of claims alleged in the cited cases had little to do with the holdings. Instead, the appellate courts dismissed the causes of action because they were, at their cores, claims for dissatisfaction with medical care. *See Kloster,* 612 N.W.2d at 774–75 (explaining that "[a]lthough Kloster takes a novel approach to bypass the provisos imposed by the workers' compensation statute," the underlying claim was that he was "call[ing] into question the reasonableness of care"); *Good,* 756 N.W.2d at 44–46 (describing the case as one in which the plaintiff "alleged

the defendants' refusal to provide prompt medical care breached their duty of good faith," and not mentioning the claim of gross negligence during its discussion of the merits). Simply put, the Court finds no logical reason to distinguish Spencer's case from *Kloster* or *Good.* Accordingly, Plaintiff has not properly exhausted his agency remedies and Annett is entitled to summary judgment on Plaintiff's claim for bad faith failure to provide medical care.

### b. *Did Annett act in bad faith in delaying Spencer's surgery?*

██ Even assuming that a bad faith claim for dissatisfaction with medical care were cognizable under Iowa law, the Court would nonetheless find that Spencer's claim in this regard fails as a matter of law. Specifically, the Court agrees with Annett's assertion that Spencer's claim for knee surgery was fairly debatable between April 2007 and October 2007.

Annett posits that the knee surgery was fairly debatable for three reasons. First, Annett claims that during the time of the jurisdictional dispute, any claim for any type of benefits was fairly debatable in light of Iowa Code § 85.72(2). Def.'s Br. at 43. Second, Annett claims it had the right to undertake a reasonable investigation, and Spencer did not cooperate in providing medical records and was, in general, an uncooperative employee during the investigation. *Id.* Third, Annett contends that because Spencer failed to submit to an independent medical examination ("IME") under Iowa Code § 85.39, Annett's only reliable source of information from an authorized physician was Dr. Schulte's January 11, 2007 opinion releasing Spencer to work with no restrictions. *See id.* at 49 (explaining that healing-period benefits could be denied during this time period). Further, the statute on its face says that if an employee fails to sub-

mit to an IME, the employer can deny benefits. *See* Iowa Code § 85.39. Thus, Annett had no true knowledge of the scope or causation of the injury and no knowledge as to whether the surgery was necessary or causally related to the alleged work incident. Def.'s Reply Br. at 18. The Court will consider each contention in turn.

### i. *The jurisdictional dispute.*

Annett claims that, due to Spencer's election to seek benefits under Tennessee law, it had a reasonable basis for delaying authorization of Spencer's surgery while the jurisdictional dispute was ongoing. Def.'s Br. at 43. Spencer responds that despite the dispute, Annett still had an affirmative duty to provide medical care to its employee. Pl.'s Br. at 7–8. For this argument, Annett relies on Iowa Code § 85.72(2) which states, in part:

> If an employee ... initiates a judicial proceeding or a contested case or similar proceeding for benefits pursuant to the laws of another state ... concerning workers' compensation, any proceeding initiated by an employee ... for workers' compensation benefits ... shall be stayed, without prejudice pending resolution of the out-of-state claim for benefits.

Spencer argues that this section of the Code is inapplicable as no "proceeding" had been initiated in Iowa, and thus there was no "proceeding" that could be stayed. Pl.'s Br. at 7. Annett does not argue that Spencer's Tennessee filing justified its refusal to authorize surgery, but rather that Spencer could not prove he was entitled to benefits at the time in question. Def.'s Reply Br. at 8. It explains that while Spencer had a pending claim in Tennessee, he was prohibited from seeking Iowa benefits, and thus a bad faith action should fail because Spencer cannot prove that he was entitled to any benefits or that he could

have sought any benefits during the dispute. *Id.*

Annett relies on two cases to support its contention. First, it relies heavily on the Iowa Supreme Court's decision in *Covia v. Robinson*, 507 N.W.2d 411 (Iowa 1993). In *Covia*, the Iowa Supreme Court considered whether an insurance company could be penalized for delaying workers' compensation benefits to an insured while a jurisdictional dispute was ongoing. *Id.* at 412. The employee in *Covia* was the victim of a horrific plane crash in Sioux City, Iowa, while flying from Denver, Colorado to Rosemont, Illinois. *Id.* The husband of the victim sought benefits in both Colorado and Iowa. *Id.* Colorado immediately paid benefits, but the employer and insurance carrier challenged the jurisdiction in Iowa. *Id.* While the jurisdictional challenge was ongoing, the employer did not pay any benefits. *Id.* The Court held that, regardless of the outcome of the jurisdictional dispute, the employer could not be penalized for delaying payment of workers' compensation benefits because the claim was fairly debatable throughout the dispute. *Id.* at 416 ("We ... find the issue fairly debatable since there are viable arguments in favor of either party.").

Similarly, in a workers' compensation arbitration decision, *Beardsley v. Dalco Construction, Inc.*, the commission considered whether an employer could be subject to penalties for failure to pay benefits after the plaintiff had also filed for benefits in Missouri. No. 5009568, 2006 WL 1736931 (June 19, 2006). The Commission held that the employer was "under no obligation to pay Iowa benefits until the Missouri claim was resolved." *Id.* at *10. The Commission went on to explain that *Covia* dictated that when a jurisdictional dispute is ongoing, the payment of benefits is fairly debatable. *Id.*

The facts of the present case diverge extensively from the facts in *Covia* or *Beardsley*. However, the legal analysis in those cases remains applicable. In the case at hand, if Tennessee law had controlled, Spencer was entitled to receive treatment from any doctor and seek reimbursement from Annett.[28] *See* Def.'s App. at 110–11. Indeed, Spencer's Tennessee counsel sent a letter to Annett explaining that "[Spencer] is going to have surgery for a torn ACL joint on May 11, 2007 … [, and u]nder Tennessee law, under [the present] circumstances he is at liberty to make his own health care arrangements and pursue a claim to be reimbursed for the bills incurred." Def.'s App. at 110–11.

Additionally, *Covia* and *Beardsley* explain that while a jurisdictional dispute is ongoing, a party is under no obligation to provide Iowa benefits during the dispute. While the dispute in this case is of a different nature than that in *Covia*, applying Iowa Code § 85.72(2), a dispute over whether an employee could receive benefits in two states would create a dispute about an employee's rights to benefits in Iowa. At its most basic, this is the same dispute as in *Covia*—whether a party is entitled to benefits. In fact, this is also what the workers' compensation commissioner decided in *Beardsley*, stating that "Iowa Code Section 85.72(2) suggests that because claimant had filed and pursued a claim in [a different jurisdiction], defendants were under no obligation to pay Iowa benefits until the [other jurisdiction's] claim was resolved." 2006 WL 1736931, at *10. Thus, while the jurisdictional dispute existed, Annett had no obligation to provide benefits or authorize surgery under Iowa law, and had no need to authorize surgery if Tennessee law applied. Essentially, while Spencer was seeking benefits in Tennessee, he could not have sought benefits in Iowa, and if Tennessee law applied, Annett had no need or obligation to authorize surgery because Spencer would have had the ability to choose any provider and then seek reimbursement. The Court finds that the question of authorization between May 2007 and June 2007 was fairly debatable as a matter of law. As a result, Annett cannot be found liable for acting in bad faith during the period of the jurisdictional dispute.

### ii. *Spencer failed to cooperate, and Annett is entitled to a reasonable investigation period.*

Annett's second claim is that an employer or insurance carrier is allowed a reasonable investigation period, and during this period, Annett had a logical basis to delay authorization of Spencer's surgery. Def.'s Br. at 43. Annett bases this contention on two main factors. First, a party is entitled to a reasonable investigation before making a determination of whether to authorize surgery. *Id.* at 46–47. Second, Annett was unable to attain medical records from Spencer, and Spencer was generally unwilling to cooperate with Annett during the investigation process. *Id.* Spencer responds that Annett's investigation was nonexistent. Pl.'s Br. at 19. For the reasons set forth below, the Court agrees with Annett and finds that Spencer's failure to cooperate, and more specifically, his failure to submit to an IME or petition for alternate medical care causes the claim to be fairly debatable.

As a threshold matter, Annett argues that it was entitled to a reasonable investigation period, and that any delay attributable to this investigation is not unreasonable. Def.'s Br. at 46. Iowa Code § 86.13 provides a penalty for a denial or delay in

---

**28.** The Court relies on Spencer's original attorney, Thomas's, interpretation of Tennessee law detailed in his May 2, 2007 letter sent to Annett. Def.'s App. at 110–11.

benefits "without reasonable or probable cause or excuse." The Iowa Supreme Court has repeatedly held that a delay for investigation falls within the statutory reasonableness limits. *See, e.g., Christensen v. Snap–On Tools Corp.*, 554 N.W.2d 254, 260 (Iowa 1996); *Kiesecker v. Webster City Custom Meats, Inc.*, 528 N.W.2d 109, 111 (Iowa 1995); *Calvert v. Am. Family Ins. Group*, No. 04–1074, 2006 WL 126635, at *4 (Iowa Ct.App. Jan. 19, 2006).

In *Christensen*, the Iowa Supreme Court expounded on the statutory language contained in Iowa Code § 86.13, explaining that "[a] reasonable cause or excuse exists if either 1) the delay was necessary for the insurer to investigate the claim or 2) the employer had a reasonable basis to contest the employee's entitlement to benefits." 554 N.W.2d at 260. However, at some point, a delay may shift from reasonable to unreasonable depending on the circumstances of the case. *See Zimmer v. Travelers Ins. Co.*, 454 F.Supp.2d 839, 867–68 (S.D.Iowa 2006) ("While a claim may be fairly debatable at one point in time, if the insurer becomes aware at a later date that the claim is no longer fairly debatable, liability for bad faith may still be imposed."); *see also McIlravy*, 653 N.W.2d at 331–33 (describing a situation in which a denial was reasonable at the outset, but following additional information it was unreasonable). Further, although a flawed "investigation cannot in and of itself sustain a tort action for bad faith[, t]he lack of proper investigation and evaluation is significant in proving the crucial element of a bad faith tort, namely knowledge by the insurer for the lack of a debatable reason for denial." *Reuter v. State Farm Mut. Auto. Ins. Co., Inc.*, 469 N.W.2d 250, 254 (Iowa 1991). Thus, the overarching issue in this bad faith claim is whether the investigation undertaken by Annett was reasonable.

Annett claims that its investigation was reasonable, that Spencer failed to cooperate with this investigation, and that the failure to cooperate constituted an objectively reasonable basis for denial of the claim. Annett relies on *AMCO Mutual Insurance Company v. Lamphere* to support this proposition. 541 N.W.2d 910 (Iowa Ct.App.1995). In *AMCO*, the plaintiff insurance company filed a declaratory judgment action that its policy did not cover certain damage, and the defendant responded with a counterclaim asserting first-party bad faith. *Id.* at 911. The plaintiff argued that the claim was fairly debatable, and based part of reasoning on the defendant's lack of cooperation throughout the process. *Id.* at 914. The Court held that the defendant's refusal to give a statement under oath or produce requested documents presented an objectively reasonable basis for denial of coverage. *Id.* As a result of this lack of cooperation, the court held that the trial court was correct in dismissing the bad faith claim. *Id.*

Similarly, in *Calvert*, the Iowa Court of Appeals reaffirmed part of its holding in *AMCO. See Calvert*, 2006 WL 126635. In that case, the plaintiff alleged bad faith failure to pay medical benefits. *Id.* at *1. The insurer asked repeatedly for the plaintiff's medical records, but the plaintiff failed to provide them. *Id.* at *4. The court recognized that a failure to provide information "can give rise to an objectively reasonable basis for a delay in payment" because an insurance company has a right to investigate claims before payment. *Id.* It then held that "[i]n light of the limited information [the defendant] had received regarding [the plaintiff's] injury, it was objectively reasonable for [the defendant] to question whether the injury was accident related, and thus whether [the plaintiff] was entitled to payment for any associated care." *Id.* at *5.

The Court agrees with Annett's contention that the undisputed facts in this case support a conclusion that, as a matter of law, Spencer's claim for knee surgery was fairly debatable from April 2007 until surgery in October 2007 because Annett was conducting a reasonable investigation during that time period. Spencer urges that Annett did no investigation of his claim, but fails to support this contention with record evidence. Although the Court is obligated to make all reasonable inferences in the light most favorable to the nonmoving party, the court need not accept unsupported assertions as true. Here, the available record evidence supports only Annett's characterization of the facts—that it undertook some investigation. First, immediately after learning of Spencer's doctor's visits in April 2007, Annett began seeking records from Dr. Dalton and Dr. Bryan. Def.'s App. at 54–55. Spencer refused to cooperate in this undertaking and told Annett that it could get the records from the doctor, but that he would not provide the records himself. *Id.* at 54. Annett repeatedly faxed both doctors, but received no results, and Spencer refused to submit to an examination by Dr. Schulte.[29] *Id.* at 55–56. On June 25, 2007, the claims-adjustor notes reveal that Annett called Dr. Dalton's office on June 1, but that the office would not release records. *Id.* at 56. By the time Spaulding contacted Annett asking for authorization for Spencer's surgery, Annett still had not received the medical records. Indeed, in a letter dated August 15, 2007, Annett clearly articulated that it still had not received medical records indicating the need for surgery, that it needed additional time for investigation, and requested that Spencer sign a patient waiver. Def.'s App. at 177.

The record thus shows that Spencer's claim was fairly debatable during Annett's investigation period. Annett was entitled to proceed with a reasonable investigation before authorizing Spencer's knee surgery. As the Iowa Court of Appeals said in *Calvert,* an insurance company has the right to investigate a claim, and where no medical records are provided, such a failure can function as a reasonable basis for a delay of benefits. 711 N.W.2d 733, at *4; *see also AMCO,* 541 N.W.2d at 914 (explaining that a lack of cooperation and a lack of requested documents served as an "objectively reasonable basis for denial of coverage"). Any delay attributable to a reasonable investigation cannot be held against the party investigating the claim. *See Christensen,* 554 N.W.2d at 260 ("In *Kiesecker,* we held a delay in making payments while the insurer investigated the claim was reasonable.") (citing *Kiesecker,* 528 N.W.2d at 111). Without medical records from Spencer's physicians or an opinion by Dr. Schulte, Annett could not verify whether the surgery was necessary and causally related to Spencer's alleged work injury. As such, Annett had a reasonable basis for delaying the surgery.

iii. *Spencer failed to submit to an IME.*

Annett also relies on Iowa Code § 85.39 for delaying the knee surgery. Iowa Code § 85.39 explains that an injured employee must submit to an IME at the request of the employer "at some reasonable time and place and as often as reasonably requested." Annett requested that Spencer be evaluated by Dr. Schulte in Des Moines, but Spencer refused. If an employee refuses to submit to the examination for some reason, the employer "shall suspend the employee's right to any com-

---

**29.** The claims-adjustor notes show that Annett faxed requests to Dr. Dalton for records on April 24, April 27, April 30, and called to follow up on May 1, May 3, and June 1. Def.'s App. at 54–56. Annett faxed record requests to Dr. Bryan on April 27 and April 30, and spoke with Dr. Bryan's office on May 1 stressing "the importance of [the] claim under investigation." Def.'s App. at 55. Annett called again on May 3 to follow up. *Id.*

pensation for the period of the refusal." *Id.* Spencer, in response, repeatedly asserts that Annett's request was "illegal" and "unreasonable" under *West Side Transport v. Cordell*, 601 N.W.2d 691 (Iowa 1999).

In relying on *Cordell*, Spencer contends that the request to return to Iowa was unreasonable and, in his estimation, "illegal." *See* Pl.'s Resp. Br. at 21. The *Cordell* case, however, was decided on the narrowest of issues: "Whether the employer loses the right to choose a claimant's care following a decision by the commissioner that the employer must provide medical care in a location closer to the claimant's residence." *Cordell*, 601 N.W.2d at 693. The Iowa Supreme Court held that after the plaintiff had followed through with the statutory requirements of Iowa Code § 85.27—the alternate medical care petition statute—that he could direct his own care where the employer failed to provide reasonable care. *Id.* at 693–94. In other words, the plaintiff first exhausted all agency remedies.

Annett responds that Spencer's reliance on *Cordell* is misplaced because *Cordell* is inapposite, i.e., *Cordell* discusses medical treatment and care under Iowa Code § 85.27(4) rather than an IME as outlined in § 85.39. Annett points out that under § 85.27(4), medical care must be "promp[t] and [ ] reasonably suited to treat the injury without undue inconvenience to the employee," but under § 85.39, the request must only be "reasonable." It further claims that an employee's refusal to submit to an IME is an issue of fact, subject to a contested case proceeding by the workers' compensation commissioner. Def.'s Reply Br. at 24 (citing Iowa Admin. Code 4.1(12)). Additionally, Annett cites one workers' compensation commission decision in which the commission stated that an employer could request an employee to travel a long distance, so long as the employee's needs are provided for by the employer. *Takes v. ARA Servs., Inc.*, File No. 1039871, 1995 WL 17018584, at *3 (Iowa Workers' Comp. Comm'n Oct. 27, 1995) ("Certainly, claimant may be required to travel long distances but only if their needs are specially provided for by defendants.").

The Court agrees with Annett that Spencer's refusal to submit to an IME created an objectively reasonable basis for denial or delay of benefits. Contrary to his arguments, the Court finds that Spencer's reliance on *Cordell* in this situation is misplaced. Although *Cordell* held that requiring a plaintiff to travel long distances for treatment may be unreasonable, the reach of the decision is substantially limited, and does not apply to the facts of this case. First, the *Cordell* case decided a "narrow issue" of whether an employer could lose control of an employee's medical care outside of denying liability. 601 N.W.2d at 693. The *Cordell* court simply held that an employer can lose its right to direct care in certain situations—such as the one in that case—without denying liability for the injury. *Id.* at 694. Despite Spencer's assertion, *Cordell* does not stand for the proposition that every time someone has to travel for treatment, it is illegal or unreasonable. *See id.*

Second, the facts of *Cordell* differ from the facts in the present case. The *Cordell* plaintiff followed the proper "statutory procedure in section 85.27 [when] he was dissatisfied with the treatment," and filed an alternate medical care petition. *Id.* Moreover, *Cordell* dealt with medical treatment, rather than an IME as in the present case. As discussed above, a request for an IME is judged by a different standard than is a request for medical treatment. *Compare* Iowa Code § 85.27(4) *with* Iowa Code § 85.39. In *Cordell*, the plaintiff was seeking treatment for an injury that the defendant admitted

was work-related. *Id.* at 693. In the present case, the defendant was seeking additional information to decide whether surgery was causally related to an alleged work injury and whether it was medically necessary.

The reasonableness of Annett's request that Spencer return to Iowa for an IME is fairly debatable. According to *Takes,* an employer can request an employee to travel for an IME as long as that proper arrangements are provided. 1995 WL 17018584 at *3. In his May 8, 2007 letter, Annett's attorney, Chris Scheldrup, offered to provide arrangements for Spencer to travel to Des Moines. Def.'s App. at 177. The Court will not and need not consider whether the request was, in fact, unreasonable, but merely whether such a refusal made the claim for knee surgery fairly debatable. *See Bellville,* 702 N.W.2d at 473 (explaining that when determining whether a claim is fairly debatable "[t]he focus is on the existence of a debatable issue, not on which party was correct"). Because an employer can refuse benefits and compensation on the basis of the employee's refusal to submit to an IME, Spencer's refusal provided a reasonable basis for Annett's delay in authorizing Spencer's knee surgery. If Spencer believed the request to be unreasonable, the workers' compensation commission allowed him to challenge it as such. Because Spencer never filed an alternate medical care petition, whether the IME was reasonable remained fairly debatable, and Annett did not act in bad faith by delaying authorization of Spencer's knee surgery. Annett was entitled to withhold benefits during the period where Spencer refused to submit to an IME. *See* Iowa Code § 85.39.

5. *Spencer's claim for failure to provide healing-period benefits.*

■ Spencer's fourth claim is that Annett acted in bad faith by not providing him healing-period benefits when waiting for the surgery to be authorized—from April 2007 to October 2007. Annett does not deny that the claim for healing-period benefits and the employer's alleged delay is cognizable under Iowa law as a potential bad faith claim. As a result, the Court will not consider that issue. For this claim, both parties assert substantially similar arguments to those discussed above in Section III.A(4)(b) of this Order, relating to Spencer's claim for failure to provide medical care. The Court finds that the similarities between the two claims make them indistinguishable and adopts the reasoning set forth above to decide Spencer's claim for failure to provide healing-period benefits between April 2007 and October 2007. Accordingly, the Court grants summary judgment in favor of Annett with respect to Spencer's claim for healing-period benefits.

6. *Spencer's claim for failure to provide for total knee replacement.*

■ Spencer's final bad faith claim is that Annett failed, and continues to fail, to authorize a total knee replacement. Am. Compl. ¶ 9e. At oral argument, the two parties agreed that this claim was not being pursued. Hr'g Tr. at 13. In line with the statements at oral argument, Spencer filed a motion to dismiss the claim without prejudice. Clerk's No. 56. Annett resisted, however, explaining that the motion was improper, noting that Spencer had admitted that the claim was fairly debatable, and asking the Court to dismiss the case during summary judgment. *See* Clerk's No. 63. At oral argument, Spencer's attorney did, in fact, concede that the claim for failure to provide for a total knee replacement was fairly debatable as to the causation aspect. Hr'g Tr. at 11 ("THE COURT: So you concede that the matter of causation between 1–2–07 and the diagnosis of the need for the total knee is fairly debatable? MR. SPAULDING: I believe

that part of the claim is."). As a result, the Court need not belabor the point and give full consideration to the question. The Court grants Annett's motion for summary judgment with regard to Plaintiff's bad faith claim for failure to provide a total knee replacement.

### 7. *Spencer's claim for punitive damages.*

 A claim for punitive damages is only applicable where the court finds that a defendant's conduct "constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1(1)(a). Willful and wanton conduct is conduct that involves an intentional, unreasonable act "in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow." *Cawthorn v. Catholic Health Initiatives Corp.*, 743 N.W.2d 525, 529 (Iowa 2007) (internal citations and quotation marks omitted). Punitive damages can only be awarded when there has been some type of actual or legal malice. *Id.* "Actual malice may be shown by things such as personal spite, hatred, or ill-will, and legal malice may be shown by wrongful conduct committed with a willful or reckless disregard for the rights of another." *Id.* (internal citations and quotation marks omitted). In the present case, the record shows no evidence of either actual or legal malice. As a result, the Court grants Annett's motion with respect to punitive damages.

### B. *Spencer's Motion for Partial Summary Judgment*

The Court now turns to Spencer's Motion for Partial Summary Judgment.

Clerk's No. 17. In his motion, Spencer asks the Court to apply the doctrine of judicial estoppel and bar Annett from disputing liability for Spencer's alleged work-related injury on January 2, 2007.[30] Mot. for Part. Summ. J. ¶ 1. Annett responds that the circumstances of this case make judicial estoppel inapplicable. Def.'s Resistance Br. at 4.

 Judicial estoppel is an equitable doctrine designed to protect the integrity of the judicial process. *Tyson Foods, Inc. v. Hedlund,* 740 N.W.2d 192, 196 (Iowa 2007). The Iowa Supreme Court has described it as a "commonsense doctrine" that "prohibits a party who has successfully and unequivocally asserted a position in one proceeding from asserting an inconsistent position in a subsequent proceeding." *Vennerberg Farms v. IGF Ins. Co.*, 405 N.W.2d 810, 814 (Iowa 1987). Success is generally a pre-requisite for applying the doctrine because "[a]bsent judicial acceptance of the inconsistent position, application of the rule is unwarranted because no risk of inconsistent, misleading results exists." *Id.* As part of judicial acceptance, the previous, inconsistent theory or assertion must have been relevant to the court's or administrative agency's ruling. *Hedlund,* 740 N.W.2d at 197. The doctrine, however, is limited in scope. Although it applies in the context of administrative as well as court proceedings, *id.* at 196, the doctrine can only be applied in those cases "involving privity with, or prejudice to, the party invoking the doctrine," *Wilson v. Liberty Mut. Grp.,* 666 N.W.2d 163, 166 (Iowa 2003).

---

**30.** It is important to note that liability does not imply causation of injuries that require treatment—i.e., solely because Spencer fell at work does not mean that the fall necessitated knee surgery; a doctor must still testify to, and the party must still prove, causation. Rather, liability in this context means simply that Annett must recognize that Spencer suffered a work injury on January 2, 2007.

Within the workers' compensation context, judicial estoppel usually arises where an employer has attempted to direct an employee's medical treatment, but later denies compensability to withhold payment of benefits. *See Winnebago Indus., Inc. v. Haverly,* 727 N.W.2d 567, 575 (Iowa 2006). Indeed, to allow an employer to control the medical care of an employee while simultaneously allowing that same employer to free itself of any obligation to later pay for medical care or benefits is a contravention of justice and fairness. Such a result, as the Iowa Supreme Court related, "simply does not advance the policy goal of avoiding inconsistent and misleading results." *Hedlund,* 740 N.W.2d at 198. It does not respect judicial integrity. Generally, once an employer admits liability for a claim in an alternate medical care proceeding, it is bound by that assertion. *See Winnebago,* 727 N.W.2d at 575 (explaining that it would take a "significant change in the facts after the admission of liability" in order to later deny liability); *Hedlund,* 740 N.W.2d at 198–99 (describing the critical role that admitting liability plays in an alternate medical care proceeding). This is because "[l]iability is normally an important component of the course of an alternate medical care proceeding." *Hedlund,* 740 N.W.2d at 198. Without first admitting liability, the workers' compensation commissioner cannot hear the case. Iowa Admin. Code r. 876–48.7 ("Application cannot be filed under this rule if the liability of the employer is an issue."). "[T]he commissioner normally relies on [the admission of liability] in disposing of the application." *Hedlund,* 740 N.W.2d at 198.

*Haverly* provides an ideal example of how judicial estoppel may function in this context. In *Haverly,* the defendant-employer participated in an alternate care proceeding after a defendant had requested authorization for surgery. 727 N.W.2d at 570. The employee later filed an arbitration petition for benefits, and at this time, the defendant-employer denied liability. *Id.* After multiple appeals, the case reached the Iowa Supreme Court, which had to decide whether judicial estoppel should apply. The Court held that under a judicial-estoppel theory, a party was prohibited from admitting liability in one proceeding to direct medical care, then denying liability in another to avoid payment of benefits. *Id.* at 574. The Court in *Haverly* did, however, leave the question of whether a party can later deny liability somewhat open—it recognized the possibility that "[t]here might, in some cases, be a significant change in facts" to allow a party to change its position on liability. *Id.*

The case at bar fulfills all elements of judicial estoppel, and to allow Annett to move forward with its counterclaims, all founded on a denial of liability for Spencer's knee injury, would insult judicial integrity. First, the two cases fall within the scope of the doctrine—the two parties are the same parties in the previous case, and permitting Annett to move forward with its counterclaims would be prejudicial to Spencer. Thus, the case satisfies the "privity or prejudice" requirement set forth in *Wilson.* 666 N.W.2d at 166.

Second, Annett is putting forward two inconsistent positions. While Annett now claims that Spencer's injury in January of 2007 was not work-related, it has previously admitted liability for such injury. This admission was necessary for Annett to participate in the alternate medical care petition. *See* Iowa Admin. Code r. 876–48.7. As the Iowa Supreme Court phrased it in *Hedlund,* "[l]iability is normally an important component of the course of an alternate medical care proceeding."[31] 740

31. There is nothing about the present circumstances to indicate that the alternate medical

N.W.2d at 198. The fact Annett is now denying liability is contrary to the admission of liability in the alternate medical care proceeding. The "inconsistent position" requirement, then, is also satisfied.

Third, Annett has unequivocally asserted both inconsistent positions. While it tacitly agreed to an admission of liability to participate in the June 2010 alternate medical care proceeding, it then participated in extended appeals of that decision, most recently in the Spring of 2012. As it participated in these appeals, it continuously represented that liability was not an issue. Indeed, if it had denied liability at this time, the case would have been dismissed as moot because Annett no longer would have been able to direct care. Annett claims that there is legal authority stating that participating in the appeals proceedings is the same as participating in the original alternate medical care proceeding. Def.'s Resp. Br. at 9. Additionally, Annett claims that it participated in these appeals for "purely academic" reasons, as the appeal would play a part in how the company would deal with future cases with similar circumstances. *Id.* The problem with Annett's position is that Annett apparently never informed the Polk County District Court, the Iowa Court of Appeals, or the Iowa Supreme Court that this case was "purely academic." [32]

 In Iowa, there is a general rule against a court hearing a moot case such as the one presented in this case. *See Christensen v. Iowa Dist. Ct. for Polk Cnty.*, 578 N.W.2d 675, 679 (Iowa 1998) ("This court will generally dismiss an appeal when judgment, if rendered, will have no practical legal effect upon the existing controversy" (internal quotation marks and citations omitted) (quoting *Roth v. Reagen*, 422 N.W.2d 464, 466 (Iowa 1988)); *Iowa Freedom of Info. Council v. Wifvat*, 328 N.W.2d 920, 922 (Iowa 1983) ("Generally we will not consider an action if it no longer presents a justiciable controversy.")). "A case is moot when the contested issue has become academic ... and the court's opinion would be of no force or effect in the underlying controversy." *Maghee v. State*, 773 N.W.2d 228, 233 (Iowa 2009) (emphasis added); *accord In re M.T.*, 625 N.W.2d 702, 704 (Iowa 2001); *In re Interest of D.C.V.*, 569 N.W.2d 489, 494 (Iowa 1997). Courts recognize an exception to the doctrine, however, and possess discretion to hear moot cases where the matter fulfills two criteria: 1) "matters of public importance are presented" and 2) "the problem is likely to recur." *Iowa Freedom of Info. Council*, 328 N.W.2d at 922; *accord Maghee*, 773 N.W.2d at 234; *Christensen v. Iowa Dist. Ct.*, 578 N.W.2d at 679. Although true that a court has the discretion to hear such cases, there is no legal authority indicating a party, on its own volition, possesses the equivalent right. *See Berleen v. Iowa Dep't of Pub. Safety*, 260 Iowa 699, 150 N.W.2d 593, 594

---

care proceeding was anything other than a normal proceeding. In *Hedlund*, the Iowa Supreme Court recognized the facts were an exception to the general alternate care petition. 740 N.W.2d at 199. In the case, although the employer admitted liability in the alternate medical care petition, the admission of liability in no way influenced the outcome of the case—it was dismissed for different reasons. *Id.* As a result, liability was not material in the prior case and when the employer took a different stance in a different proceeding, judicial estoppel did not apply. *Id.*

32. In neither Judge Romano's June 7, 2011 decision nor the Iowa Court of Appeals' March 28, 2012 decision, do either of the judges writing the opinion address the mootness issue. *See* Pl.'s App. at 160–79 (containing the full text of both decisions). Additionally in Annett's resistance for further review to the Iowa Supreme Court, Annett again never mentions the mootness issue. *See* Pl.'s Partial Summ. J. App. at 72–78.

(1967) ("[W]here a question of public interest is involved it lies in the discretion of the court to pass on the question."); *accord In re T.S.*, 705 N.W.2d 498, 501 (Iowa 2005) ("We do not decide cases where there is no longer any actual controversy, unless we exercise our discretion and decide the case under an exception to the mootness doctrine." (emphasis added)); *Christensen*, 578 N.W.2d at 679 ("In such a situation, [where matters of public importance are presented and the problem is likely to recur,] this court has discretion to consider the appeal . . . ." (emphasis added)). A cursory review of relevant Iowa appellate decisions reveals that when a court decides to hear a moot case, it expressly states the reasons for hearing the case in its opinion. *See, e.g., Maghee*, 773 N.W.2d at 234–35; *In re T.S.*, 705 N.W.2d at 502; *Christensen*, 578 N.W.2d at 679.

In the present case, neither Judge Romano's district court decision nor the Iowa Court of Appeals decision has any language indicating that either court knew the case was moot. In fact, in beginning its analysis, the Iowa Court of Appeals explicitly stated that "[t]he facts are not in dispute. Douglas Spencer suffered a work-related injury." *Spencer*, 815 N.W.2d 410, at *1. There is no corresponding footnote or any portion of the opinion that explains Annett now disputes Spencer was injured at work. Annett has unequivocally asserted this inconsistent position to the Iowa Court of Appeals in 2012 while this case, the federal case, was in front of this Court. These circumstances satisfy the third element of judicial estoppel, that the party unequivocally holds inconsistent positions.

Fourth, the inconsistent positions were material in both cases. As discussed above, a party cannot participate in an alternate medical care proceeding unless it first admits liability. Iowa Admin. Code r. 876–48.7. According to *Hedlund*, this is an

"important component" in alternate medical care proceedings, and the commissioner relies on admissions of liability to determine how to proceed. 740 N.W.2d at 198. Annett would not have been able to participate in the alternate medical care proceeding if it had not admitted liability. In the case now before this Court, Annett's contention that Spencer fabricated his work injury forms the basis of Annett's counterclaims. For this reason, the Court finds that the inconsistent positions are relevant in both cases.

Finally, the inconsistent theory must have been successful in the previous case. Without a successful outcome, the policy considerations of judicial estoppel—that two courts may issue inconsistent and misleading rulings-are not implicated. *Vennerberg Farms*, 405 N.W.2d at 814. In the present circumstances, Annett was successful in appealing the alternate medical care determination. Therefore, to let Annett assert its counterclaims in this case presents a great potential for inconsistent and misleading rulings. The Iowa Court of Appeals opinion stated that "Douglas Spencer sustained a work-related injury" and ruled in Annett's favor. *Spencer*, 815 N.W.2d 410, at *1, *6. For this Court to now to hold otherwise—that the facts are largely in dispute and that Spencer did not suffer a work-related injury—would create an inconsistent and misleading ruling.

■ In contrast, Annett asserts three reasons why judicial estoppel should not apply in this context. First, it claims that there is an additional element of judicial estoppel, i.e., that there must be some intent to mislead the court. Def.'s Resistance Br. at 9–10. *Hedlund* makes clear, however, that in Iowa, intent is not required to apply judicial estoppel. 740 N.W.2d at 196 n. 5. The Iowa Supreme Court held that "a party's intent is not a mandatory requirement, but may be con-

sidered insofar as it is relevant to pursuit of the stated goal of judicial estoppel: protection of the integrity of the judicial process." *Id.*

■ Second, Annett contends that the workers' compensation commission and the state court did not decide the exact same issue. Def.'s Resistance Br. at 7. While this is accurate, it is a misstatement of the elements of judicial estoppel. Unlike issue preclusion, where such a finding is necessary, *Haverly*, 727 N.W.2d at 572, judicial estoppel requires only that the party had taken two inconsistent positions, both of which would be material to the outcome of the case. Therefore, although the issue is not precisely the same in both cases, the inconsistent positions regarding liability played key roles in both proceedings. This is enough to satisfy the requirements of judicial estoppel.

Third, Annett attempts to rely on *Haverly's* statement that a substantial change of circumstances may justify a party's change in position. *See* 727 N.W.2d at 575. Annett contends that when it participated in the June 2010 alternate care proceeding, it did not have enough information to deny liability. By the time that Annett participated in the June 2010 proceeding, however, Landrum had already called Annett in August 2009 to inform Annett that Spencer had injured himself falling at home rather than by falling off his truck. Further, Annett had already taken Landrum's recorded statement. Annett emphasizes that it wanted a notarized statement from Landrum before it could deny liability, and that Landrum did not provide such a statement until October 2010. Annett's position in this regard is tenuous at best, however, given that one month prior to receiving Landrum's notarized statement, in September 2010, Annett filed a counterclaim for fraud in the state-court bad faith case.

Even if the court assumes that Annett wanted Landrum's notarized testimony and an opinion from a doctor that the knee injury could have resulted from the type of fall Landrum claimed, Annett had all the information necessary to deny liability in December of 2010. Indeed, in January of 2011, Annett wrote a letter to Spencer informing him that they would be contesting liability. Yet, despite all of this, Annett continued to participate in the appeals process of the June 2010 alternate medical care petition, which required an admission of liability. Annett claims that this was merely an "academic" pursuit, but it failed to inform any state court that the case was moot. When Judge Romano decided the case on June 7, 2011, she never mentioned the mootness of the case. Similarly, when the Court of Appeals heard the case in March of 2012, it never mentioned the case was moot; it decided the case on the understanding that the facts were not in dispute and that the plaintiff had sustained a work-related injury. *Spencer*, 815 N.W.2d 410, at *1. Throughout the process, it appears that Annett hid the mootness of the case from the court and never allowed the court to exercise its discretion to decide whether to hear the case. Instead, it moved forward because it believed a ruling would be valuable in the future.

Overall, Annett's counterclaims are precisely the type of claims that judicial estoppel was created to prohibit. The record is clear that if this Court were to allow Annett's counterclaims to move forward, it would create the potential for inconsistent and misleading opinions—the specific outcome the Iowa Supreme Court sought to avoid by adopting judicial estoppel. In the Court of Appeals opinion, it specifically states that "The facts are not in dispute. Douglas Spencer suffered a work-related injury." *Spencer*, 815 N.W.2d 410, at *1. If Annett's counterclaims were to survive, a fact-finder could determine that Spencer

fabricated his claims. As a result, to protect judicial integrity, this outcome must be avoided. Therefore, for this reason, and for the reasons stated above, the Court grants Spencer's Motion for Partial Summary Judgment, and dismisses all counterclaims against Spencer.

## IV. CONCLUSION

For the reasons stated herein, Annett's Motion for Summary Judgment (Clerk's No. 18) is GRANTED. Many of the bad faith claims are not cognizable under Iowa law, and to the extent that any of Spencer's claims are cognizable, the claims were fairly debatable. Similarly, Spencer's Motion for Partial Summary Judgment (Clerk's No. 17) is GRANTED. Permitting Annett to proceed with its counterclaims would offend judicial integrity under the doctrine of judicial estoppel. Additionally, for reasons addressed herein, Annett's Motion for Leave to File Second Supplemental Appendix (Clerk's No. 50) is GRANTED, and Spencer's Motion to Dismiss Without Prejudice (Clerk's No. 56) is DENIED. In light of the Court's rulings on the two motions for summary judgment, Spencer's Motion for Trial by Court of Counterclaim (Clerk's No. 31), Spencer's Motion to Bifurcate/Sever (Clerk's No. 33), Annett's Motions in Limine (Clerk's No. 53), and Spencer's Motions in Limine (Clerk's No. 58) are all DENIED as moot. The Clerk of Court is directed to enter judgment in favor of Annett on all of Plaintiff's claims in the Amended Complaint, and in favor of Spencer on all of Annett's counterclaims.

IT IS SO ORDERED.